UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| FIELD AEROSPACE, INC., *et al.*, | : | Case No. 1:17-cv-379 |
| Plaintiffs, | : | Judge Timothy S. Black |
| vs. | : | |
| THE BOEING COMPANY, | : | |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION (Doc. 5)

This civil action is before the Court on Defendant The Boeing Company's motion to dismiss for lack of personal jurisdiction (Doc. 5) and the parties' responsive memoranda (Docs. 16 and 23).[1]

### I.   FACTS <u>AS ALLEGED</u> BY THE PLAINTIFFS

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiffs; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

**A.   The Field Entities**

In April 2012, an Ohio corporation named AVAMCO was formed to acquire two companies: Field Aviation, Inc. ("FAI," an Ohio Corporation) and Field Aviation Company, Inc., ("FACI," a Canadian entity).[2] (Doc. 16, Ex. 1 at ¶ 3). AVAMCO later

---

[1] Plaintiffs include Field Aerospace, Inc. and Field Aviation Company, Inc. (collectively, "Field").

[2] FACI is a subsidiary of Field Aerospace, Inc., an Ohio corporation (Doc. 4 at ¶ 2).

changed its name to Field Aerospace, Inc. (*Id.* at ¶ 4). The Field family of companies specializes in aircraft modification. (*Id.* at ¶ 6). Dan Magarian has at all times served as Chairman of Field Aerospace and its predecessor AVAMCO, based out of Cincinnati, Ohio. (*Id.* at ¶ 2).

B. **The relationship between Boeing and the Field Entities**

In late spring 2012, Boeing "cold called" FAI's Ohio office, seeking a strategic partner for its mid-market intelligence, surveillance, and reconnaissance/maritime surveillance aircraft program ("MSA program"). (Doc. 16-1 at ¶ 7). Shortly after that call, Boeing presented a program pitch to Field's Ohio-based Chairman (Magarian) as well as to other Field executives. (Doc. 16-1 at ¶ 8). Field and Boeing discussed Field providing proprietary engineering and modification services for the MSA program, beginning with one prototype aircraft: the MSA Demonstrator. (Doc. 16-1 at ¶ 12; Doc. 1-1 at ¶ 8).

During Boeing's initial presentation, Field informed Boeing of Field's plans to build an Aviation Center of Excellence in Ohio. In internal emails immediately after that pitch, Boeing executives described the possibility of a Field facility in Ohio as "[t]oo good to be true," and "in the right location." (Doc. 16-2, Ex. A).

Magarian sent Boeing a follow-up letter on June 29, 2012 on FAI letterhead, listing a Cincinnati, Ohio, address, to express Field's interest in partnering with Boeing. (Doc. 16-1 at ¶ 10; Ex. A). A week later, Field's Contract Manager, David MacNeil, sent a Budgetary Letter to Boeing, providing a rough pricing estimate for the MSA

Demonstrator project. MacNeil's letter, and an attached summary and support letter from Magarian, were sent on FAI letterhead that listed a Cincinnati, Ohio, address. (*Id.* at ¶ 11; Exs. B, C). Over the following several months, Magarian, MacNeil, and Brian Love were the principal negotiators and decision-makers for Field in connection with the MSA program. (*Id.* at ¶ 13).

As a result of the negotiations, Boeing knew that Field was seeking to build or lease a production facility in Ohio in order to perform modification work once the MSA program entered the production phase.[3] In August 2012, Magarian met with Steve Teske, a Field Marketing Director in Boeing's Dayton-area office, at a trade event in the Dayton area. (Doc. 16-1 at ¶ 21). Magarian reported that meeting to Boeing's Project Manager for the MSA project, Doug Ilgenfritz. (*Id.* at ¶ 22). Ilgenfritz then briefed Teske on Field's role in the MSA program and efforts to locate a facility in Ohio so that Teske would "have more detail and awareness" regarding the project. (*Id.*; Ex. E). Boeing offered to make Teske available to assist Field in its efforts to secure an Ohio production facility. (*Id.* at ¶ 23).

Throughout the project negotiations, Field sought to secure a long-term role as a supplier for Boeing and to gain some certainty on the scope of its work. (Doc. 16-1 at ¶ 14). On September 21, 2012, John Mackiewicz, the Boeing supplier manager who supported the MSA program, initiated a phone call with Magarian to discuss a

---

[3] Field claims that it was induced to participate in the MSA Demonstrator project by Boeing's representations that if the project was a success, Field could be involved in the production of as many as 150 MSA aircraft over the next ten years with a sales potential of as much as $10 billion. (Doc. 16-1 at ¶¶ 9, 19; Doc. 16-2, Ex. A).

commitment from Boeing to make Field its exclusive supplier for up to 30 MSA aircraft, as well as a process for how the parties would address changes to the scope of work on (and therefore the cost of) the MSA Demonstrator. (*Id.* at ¶ 25; Ex. F). Mackiewicz sent a summary of that conversation, including the parties' respective positions on those terms, to Magarian (who was based in Ohio). (*Id.*) Magarian sent a response providing a detailed summary of Field's negotiating position. (*Id.*) Among other things, Magarian recommended that the parties press forward with a term sheet for a future production contract while they negotiated and executed the MSA Demonstrator Purchase Contract ("Purchase Contract"). (*Id.*)

The production contract contemplated that Field would be Boeing's exclusive supplier for the first ten MSA aircraft and—provided that Field met certain quality and production capacity requirements—the next 20 as well. (Doc. 1-1 at ¶¶ 18-20). Although the production contract was never signed, Field undertook extensive efforts to locate a site for a production facility in Ohio. (Doc. 16-1 at ¶ 16). Those efforts included working with Governor Kasich, Senator Portman, and several local government officials; securing incentives from Jobs Ohio (a non-profit corporation designed to stimulate job creation in Ohio); and securing substantial incentives from Butler County and the City of Fairfield to expand the Butler County Airport. (*Id.* at ¶¶ 17-18). Magarian discussed many of these efforts at length with Ilgenfritz. (*Id.* at ¶ 19-20; Ex. D). Magarian advised Ilgenfritz that Jobs Ohio incentives would be available to fund the Ohio production facility. (*Id.* at ¶ 20). Ilgenfritz said that a facility in Ohio would be interesting and advantageous. (*Id.* at ¶ 19, Ex. D). Boeing encouraged and promised to support Field's

efforts, and, among other things, offered to make Teske—an Ohio based employee—available to help. (*Id.* at ¶¶ 19-23).

On October 2, 2012, Magarian sent an email to Mackiewicz on Field Aviation letterhead, showing Field's Ohio address, asking about Boeing's progress on putting a contract together. Mackiewicz responded that Boeing was updating the statement of work for the MSA Demonstrator project, and planned to issue a final Request for Proposal later that week. (Doc. 16-1 at ¶ 26; Ex. G). He added that Magarian "should not see any surprises based on the level of coordination we have been going through between the teams." (*Id.*) Mackiewicz concluded by promising to keep Magarian posted. (*Id.*)

About three weeks later, Magarian sent Ilgenfritz an email from Ohio with an agenda for their meeting in Seattle later that week. (Doc. 16-1 at ¶ 27; Ex. H). Among other things, Magarian wanted to discuss "finaliz[ing] open items on the . . . Demonstrator," "[m]ov[ing] forward with executing" the parties' contract, the scope of work on the Demonstrator, the term sheet for a future production contract, press releases for the Demonstrator project, and Field's role in marketing the MSA project. (Doc. 16-1 at ¶ 27; Ex. H). Ilgenfritz confirmed that those were all planned topics of discussion. (*Id.*) In November 2012, Boeing invited Magarian and others to come to Seattle to sign the MSA Demonstrator Purchase Contract. (*Id.* at ¶ 28; Ex. I).

### C. The Purchase Contract between Boeing and FACI

On December 4, 2012, Boeing and FACI executed the Purchase Contract. (Doc. 1-1 at ¶ 9; Doc. 9). The Purchase Contract incorporates a "term sheet" for a future production contract. (Doc. 9 at 68). The term sheet states, in relevant part:

> Given the uncertainties associated with the Demonstrator Aircraft effort and the parties' shared desire to expedite negotiations associated with the follow-on production contract, the parties have agreed to proceed with collaboration on the Demonstrator Aircraft prior to completing negotiations on a long-term production contract ("Production Contract") pursuant to which Boeing intends to purchase from Field Aviation modifications to new or used Challenger 604/605 aircraft for maritime surveillance missions (as modified for such missions, the aircraft are referred to as "MSA"). As soon as practical, the parties agree to negotiate in good faith on the terms of a Production Contract, which will include the key terms set forth below. The parties intend to sign the Production Contract at the conclusion of the Demonstrator Aircraft effort (or such earlier time as mutually agreed by the parties).

*Id.*

In July 2013, Magarian and three others from Field participated in an MSA program review with Boeing. (Doc. 1-1 at ¶ 29). During that review, Magarian discussed Field's efforts to open a facility in Ohio for the production phase of the MSA program. (*Id.*) Boeing was pleased with that development. (*Id.*) However, the parties ultimately never entered into a production contract.

### D. Boeing's termination of the Purchase Contract

In mid-2016, Boeing stopped soliciting orders for MSA aircraft. (Doc.1-1 at ¶ 28). In or around September 2016, Boeing indicated to Field that Boeing was no longer actively marketing the MSA program, and that Boeing would decline any opportunity to sell an MSA. (*Id.* at ¶ 30). On or about October 11, 2016, Boeing indicated that it

terminated the MSA program and transferred the MSA Demonstrator to another division of Boeing for an alternate use, allegedly in breach of the Purchase Contract. (*Id.* at ¶ 31). On November 1, 2016, Boeing confirmed that it terminated the Purchase Contract effective October 25, 2016, and informed Field that Boeing would not sell an MSA to customers in the future. (*Id.* at ¶¶ 32-33). Boeing also informed Field that Boeing had transferred the MSA Demonstrator to "Phantom Works," a different division of Boeing, in order to allow Boeing to use the MSA Demonstrator for other projects. (*Id.* at ¶ 34).

On November 7, 2016, Field submitted a proposed termination settlement of $7,126,280, representing the value of the MSA Demonstrator ($6,478,600), plus the value of all Boeing-approved changes ($647,680). (Doc. 1-1 at ¶ 36). Boeing did not pay the proposed settlement amount. (*Id.* at ¶¶ 37-38). Field claims Boeing is using the MSA Demonstrator to explore non-MSA projects. (*Id.* at ¶ 40). <u>To date, Boeing has not paid Field for its work on the MSA Demonstrator</u> or for the use of Field's intellectual property on the MSA Demonstrator. (*Id.* at ¶ 41).

### E. Plaintiffs' Complaint

On June 1, 2017, Plaintiffs filed a Complaint containing four counts, each premised on the allegation that Boeing has unlawfully retained benefits under the Purchase Contract without compensating Field. Count One alleges Boeing breached the terms of the Purchase Contract by (1) transferring the MSA Demonstrator to a different division in violation of the terms of the Purchase Contract and (2) prematurely terminating the Purchase Contract and refusing to pay the proposed settlement amount. (Doc. 1-1 at ¶ 42-51). Count Two alleges that Boeing has been unjustly enriched by

7

retaining the MSA Demonstrator, which contains Field's labor and intellectual property. (*Id.* at ¶¶ 52-60). Count Three alleges Boeing has misappropriated Field's trade secrets by retaining the MSA Demonstrator. (*Id.* at ¶¶ 61-70). Count Four alleges Boeing breached the duty of good faith and fair dealing imposed by the Purchase Contract. (*Id.* at ¶¶ 71-75).

The Complaint does not allege that the contemplated production contract was ever executed, nor does the Complaint allege a breach of any such production contract.

## II. STANDARD OF REVIEW

Before addressing Plaintiffs' motion for preliminary injunction (Doc. 11), the Court must consider the issue of personal jurisdiction. *See, e.g.*, *Action Freight Servs., LLC v. Thorne*, No. 07-12553, 2007 WL 1830783, at *1 (E.D. Mich. June 22, 2007) (citing *Kroger Co. v. Malease Foods Corp.,* 437 F.3d 506, 510 (6th Cir. 2006)). Plaintiffs bear the burden of establishing personal jurisdiction. *Mich. Nat'l Bank v. Quality Dinette, Inc.,* 888 F.2d 462, 466 (6th Cir. 1989). In deciding whether personal jurisdiction exists, a court has discretion to hold a hearing or to rely on the affidavits and factual allegations in the pleadings. *Id.*

Generally, where the court relies solely on written submissions and affidavits, plaintiffs "need only make a *prima facie* showing of jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). However, when injunctive relief is sought, a stronger showing must be made. *See*, *e.g.*, *Catalog Mktg. Servs., Ltd. v. Savitch*, No. 88-3538, 1989 U.S. App. LEXIS 22172, at *2 (4th Cir. Apr. 24, 1989) ("The Second Circuit has held that when a preliminary injunction is requested, the plaintiff must

demonstrate that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits."). If the court rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, "by affidavit or otherwise[,] . . . specific facts showing that the court has jurisdiction." *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). In ruling on a 12(b)(2) motion, the "court will not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Neogen,* 282 F.3d at 887. A court must construe the facts presented in the pleadings and affidavits in the light most favorable to the nonmoving party. *See Serras*, 875 F.2d at 1214.

### III. ANALYSIS

When the court's jurisdiction is founded on diversity of citizenship, the court can exercise personal jurisdiction over a defendant only if personal jurisdiction is "(1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Tharo Sys., Inc. v. cab Produkttechnik GmbH & Co. KG*, 196 Fed. App'x 366, 369 (6th Cir. 2006) (quoting *Neogen,* 282 F.3d at 888).

### A. Ohio's Long-Arm Statute

"Ohio's long-arm statute grants Ohio courts personal jurisdiction over a non-resident if his conduct falls within the nine bases for jurisdiction listed by the statute," but also explicitly states that such jurisdiction extends only to claims "arising from" such enumerated conduct. *Conn v. Zakharov*, 667 F.3d 705, 712 (N.D. Ohio 2016); Ohio Rev.

Code § 2307.382(C). Thus, if a plaintiff does not allege that an out-of-state defendant's conduct in Ohio gave rise to the plaintiff's claims, "[t]his should be the end of our inquiry." *Conn*, 667 F.3d at 713.

Ohio's long-arm statute provides in relevant part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

    (1) Transacting any business in this state
    (2) Contracting to supply services or goods in this state;
    (3) Causing tortious injury by an act or omission in this state;
    (4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;
    …
    (6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state…

(C) When jurisdiction over a person is based solely on this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

Ohio Rev. Code § 2307.382(A), (C).

### 1. *Transacting Business*

Field argues Boeing "transacted business" in Ohio by contacting, and then negotiating with, an Ohio resident (Magarian). (Doc. 16 at 7). The Court does not agree with Field's analysis.

"Transacting business" is defined as "to carry on business, as well as to have dealings, and . . . is farther reaching than the term contract." *Evenflo Co., Inc. v.*

*Augustine*, No. 3:14-cv-00076, 2014 WL 3105016, at *4 (S.D. Ohio July 3, 2014); *see also Brunner v. Hampson,* 441 F.3d 457, 464 (6th Cir. 2006) ("[t]he term 'transacting any business' as used in . . . the statute . . . will be given broad interpretation."). <u>However, the out-of-state defendant must have "ongoing substantive contacts," and "the existence of a contract or simply soliciting business in Ohio is not enough."</u> *Evenflo Co.,* 2014 WL 3105016 at 10. (emphasis supplied).

Two factors help determine whether an out-of-state defendant "transacted business" within the meaning of the long-arm statute. *Hitachi Med. Sys. Am., Inc. v. St. Louis Gynecology & Oncology, LLC*, No. 5:09-cv-2613, 2011 WL 711568, at *5 (N.D. Ohio Feb. 22, 2011). The first factor is whether the out-of-state defendant initiated the dealing. *Id.* The second factor is "whether the parties conducted their negotiations or discussions in the forum state, or with terms affecting the forum state." *Id.* If the parties negotiated in Ohio with provisions affecting Ohio, the nonresident transacted business in Ohio. *Id.* However:

> merely directing communications to an Ohio resident for the purpose of negotiating an agreement, without more, is insufficient to constitute "transacting business." "Rather, there must additionally be some continuing obligation that connects the non-resident defendant to the state or some terms of the agreement that affect the state."

*Id.* (citations omitted).

Here, while there is evidence that Boeing directed communications to, *inter alia*, Magarian in Ohio while negotiating the Purchase Contract, <u>there are no "continuing obligations" connecting Boeing, or the Purchase Contract, to Ohio</u>. The Purchase Contract is between Boeing, a Delaware corporation, and FACI, a Canadian company.

11

(Doc. 9). FACI's proposal states that the work to be performed under the Purchase Contract "shall be designed, installed, and tested by Field Aviation at its facility in Mississauga, Ontario, Canada…" (Doc. 22-1 at 9). The proposal does not contemplate work in Ohio or reference Ohio in any way. (*Id.*) The Purchase Contract that was ultimately executed reflects the same understanding—that all of the work related to the MSA Demonstrator would take place in Canada. (Doc. 9 at 4).

Field argues, however, that this case is similar to *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear*, where the Supreme Court of Ohio held that Mitchell's, a Georgia corporation, "transacted business" in Ohio by negotiating the lease of a Kentucky storeroom over the phone with the plaintiff, an Ohio limited partnership, and by mailing the signed contract to the plaintiff in Ohio. 53 Ohio St. 3d 73, 75-76 (1990). The Supreme Court reasoned that Mitchell's created "ongoing duties and obligations for the life of the contract" by mailing the contract to an Ohio resident in Ohio. *Id.* at 76.

The Court finds *Kentucky Oaks* distinguishable. Here, Boeing did not create "ongoing duties and obligations" in the state of Ohio. <u>The *only* connection between Boeing, the Purchase Contract, and the State of Ohio is the fact that Magarian resided there and participated in contract negotiations</u>. But that fact is insufficient to constitute "transacting business" in the absence of any other continuing obligation to this state. *Hitachi*, 2011 WL 711568, at * 5.

Field spends much of its effort arguing that Boeing was attracted to working with Field because of its Ohio location, and that Boeing intended for performance under a <u>future</u> production contract to occur in Ohio. (*See* Doc. 16 at 13-14; Doc. 25 at 5-9). That

12

argument fails for two reasons. First, the parties never executed the production contract. Second, even assuming that Boeing 'transacted business' in Ohio - by contemplating that performance under a hypothetical future production contract would occur in Ohio -, Ohio law would still not permit personal jurisdiction because this case - which is premised exclusively on the performance and termination of the Purchase Contract - does not arise from that business. *See* Ohio Rev. Code § 2307.382(C).

### 2. *Tortious injury and regularly conducting business*

Section (A)(4) of Ohio's long arm statute requires: (1) a tortious injury in Ohio; and (2) that the defendant conducted a regular course of business in Ohio or has collected substantial revenue from activities in Ohio.[4] *Int'l Paper Co. v. Goldschmidt*, 872 F. Supp. 2d 624, 629 (S.D. Ohio 2012). With respect to a tortious injury, Field argues that Boeing misappropriated its intellectual property and trade secrets by permitting one of Field's competitors to inspect and remove Field's modifications from the MSA Demonstrator. (Doc. 16 at 10-11).

Field's allegation is that Boeing misappropriated FACI's trade secrets,[5] and that

---

[4] Boeing has four offices in Ohio which conduct business for the Department of Defense, NASA, and other customers. (Doc. 6-1 at ¶ 18). Boeing has more than 500 employees in Ohio. (*Id.* at ¶ 19). In fact, on its website, Boeing notes that it does business with nearly 400 suppliers and vendors and $10.5 billion in supplier/ vendor purchases in Ohio.

[5] The Complaint alleges Boeing is in possession of "Field's" trade secrets. (Doc. 1-1 at 65). But Field has acknowledged the only trade secrets at issue involve work FACI performed on the MSA Demonstrator under the Purchase Contract. (Doc. 1-1 at ¶ 64 ("The MSA Demonstrator contains Field's trade secrets, including but not limited to technical information, engineering processes and designs, and physical modifications to the MSA Demonstrator airframe."); Doc. 16 at 9 ("Boeing acquired access to Field's proprietary information solely through the Purchase Contract.")).

this caused an indirect injury in Ohio because FACI's parent company—plaintiff Field Aerospace—is an Ohio company. This argument ignores the principle of corporate separateness, under which "[p]arent and subsidiary corporations are distinct legal entities." *Hoover Universal, Inc. v. Limbach*, 575 N.E.2d 811, 814 (Ohio 1991). Even if Field Aerospace was financially impacted in Ohio, only FACI—the entity that claims the trade secrets—could have suffered the alleged tortious injury. *Bachtel v. Barker,* No. 1:15cv434, 2016 WL 339931 at *5 (S.D. Ohio Jan. 28, 2016) (recognizing that a tortious injury requires a tort claim).

For these several reasons, this Court lacks personal jurisdiction under Ohio's long-arm statute.

### B. Constitutional Due Process

The Sixth Circuit has "recognized that Ohio's long-arm statute is not coterminous with federal constitutional limits," and has "consistently focused on whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend 'traditional notions of fair play and substantial justice'" when analyzing the propriety of personal jurisdiction under Ohio's long-arm statute. *Bird v. Parsons,* 289 F.3d 865, 871 (6th Cir. 2002) (*quoting Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

The Sixth Circuit employs a three-prong test to determine whether specific jurisdiction can be exercised consistent with the Due Process Clause of the Fourteenth Amendment. First, "the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state." *S. Mach. Co. v.*

*Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir. 1968). The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. *Lak v. Deer Creek Enterp.*, 885 F.2d 1293, 1300 (6th Cir. 1989) (citations omitted).

"Second, the cause of action must arise from the defendant's activities there." *Mohasco*, 401 F.2d at 381. Finally, "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection to the forum to make the exercise of jurisdiction over the defendant reasonable." *Id.*

Field asserts two arguments as to why personal jurisdiction over Boeing is constitutionally permissible. First, Field argues Boeing negotiated with Magarian in Ohio to secure the Purchase Contract. (Doc. 16 at 12).

The Court does not agree with Field's analysis. Typically, merely communicating and negotiating with a party in the forum state does not create the type of meaningful contact which supports personal jurisdiction. *See Calphalon v. Rowlette*, 228 F.3d 718, 720 (6th Cir. 2000) (finding a non-resident defendant did not purposely avail himself to Ohio by corresponding with, and visiting, the plaintiff in Ohio in the absence of evidence defendant sought to create continuous and substantial consequences in Ohio); *see also Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119 (6th Cir. 1994) (stating the use of telephone and mail generally "cannot alone provide the minimum contacts required by due process.") (citation omitted).

As explained *supra*, the Purchase Contract is a contract between Boeing, a Delaware corporation, and FACI, a Canadian company. (Doc. 9). The work under the

15

<u>Purchase Contract is to be performed exclusively in Canada.</u> (Doc. 9 at 4). <u>The Purchase Contract has virtually no connection to the state of Ohio other than the fact that one of the parties involved in its negotiation, Magarian, was located here</u>. This is precisely the kind of random and fortuitous contact that the purposeful availment requirement is designed to prevent from causing jurisdiction. *See Calphalon*, 228 F.3d at 723. The Court does not believe Boeing intended to invoke the benefits and protections of Ohio by negotiating with Magarian (among others) regarding a contract between two out-of-state companies that was to be performed in Canada.

Second, Field asserts personal jurisdiction because Boeing negotiated with Magarian in Ohio regarding a potential production contract of up to 30 additional MSAs (a contract that was never executed because Boeing elected to terminate the parties' relationship) and supported Field's desire to build an Aerospace Excellence Center in Ohio. (Doc. 16 at 12-13).

This argument fails for two reasons. Initially, <u>personal jurisdiction cannot be based on the intent to make contact with the forum sometime in the future</u>; the court must evaluate the contacts that the defendant has already made. *See Zellerino v. Roosen*, 118 F. Supp. 946, 953 (E.D. Mich. 2015). Field's argument that the production contract (which was never executed) might have been performed in Ohio cannot support a finding of personal jurisdiction. *Id.* Even if it did, this argument would not pass the second prong of the minimum contacts analysis, because <u>the contemplated production contract is not related to the claims of the Complaint, all of which are premised on the performance and termination of the Purchase Contract</u>.

Finally, and in any event, the Court does not believe that personal jurisdiction over Boeing in this case would be reasonable. In determining whether personal jurisdiction is "reasonable," the Court must balance three factors: "the burden on the defendant, the interests of the forum [s]tate, and the plaintiff's interest in obtaining relief." *Fortis Corporate Ins. V. Viken Ship Mgmt.*, 450 F.3d 214 at 223 (6th Cir. 2006).

Here, Field argues that Ohio has an interest "in securing the rights of corporations headquartered here." (Doc. 16 at 15).

This argument is not well-taken. <u>The Purchase Contract that is the subject of this Complaint is between a Canadian company and a Delaware corporation. The only ties Ohio has to this case are (1) Magarian, an Ohio resident, was involved to some extent in negotiating the Purchase Contract, and (2) the parties had contemplated that if their relationship was successful—and it was not—they would enter into a production contract at some point in the future that might have been performed in this state.</u> While it is unclear what burden litigating here would impose on Boeing, the Court notes that <u>Ohio has virtually no interest in deciding a dispute between two non-resident companies regarding a contract that was to be performed in Canada.</u>

## IV. CONCLUSION

For these reasons, Boeing's motion to dismiss for lack of personal jurisdiction (Doc. 5) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** in this Court. As the state court unknowingly did not have jurisdiction to issue the TRO (Doc. 12), it is dissolved as a matter of law.

17

**IT IS SO ORDERED**.

Date: 6/22/17

_Timothy S. Black_
Timothy S. Black
United States District Judge